J. S34044/20

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INT. OF:  K.M.M., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF:  M.M., FATHER | : | No. 443 MDA 2020 |

Appeal from the Decree Entered February 6, 2020,
in the Court of Common Pleas of Dauphin County,
Orphans' Court Division at No. 86 AD 2019

BEFORE:  PANELLA, P.J., BENDER, P.J.E. AND FORD ELLIOTT, P.J.E.

MEMORANDUM BY FORD ELLIOTT, P.J.E.: **FILED: AUGUST 28, 2020**

M.M. ("Father") appeals from the decree dated February 4, 2020, and entered February 6, 2020,[1] in the Court of Common Pleas of Dauphin County, granting the petition of C.H. ("Mother") and involuntarily terminating his parental rights to his minor child, K.K.M. (the "Child"), a female born in October of 2014, pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1), (2), and (b).  After careful review, we affirm.

Mother and Father are the biological parents of Child, who was born in October 2014, in Dauphin County, Pennsylvania.  Mother and Father never

---

[1] While dated and filed February 4, 2020, the decree was not entered for purposes of Pa.R.C.P. 236(b) until February 6, 2020 upon the docketing of notice.  **See Frazier v. City of Philadelphia**, 735 A.2d 113, 115 (Pa. 1999) (holding that "an order is not appealable until it is entered on the docket with the required notation that appropriate notice has been given"); **see also** Pa.R.A.P. 108(a) (entry of an order is designated as "the day on which the clerk makes the notation in the docket that notice of entry of the order has been given as required by Pa.R.C.P. 236(b)".).

married, but lived together briefly in the home of Mother's parents after Child's birth. (Notes of testimony, 1/17/20 at 8-9, 59, 62.) Mother testified that Father moved out after about three months. (*Id.* at 8-9.) Father saw Child off and on until approximately February 2018, when he went to Georgia for work opportunities.[2] (*Id.* at 4-5, 18, 67.) Thereafter, Father moved to North Carolina, where he currently resides. (*Id.* at 66-68.) He was subsequently incarcerated in June 2018 for a period of 14 months.[3] (*Id.* at 11-12, 87-88, 105-106.)

---

[2] Mother instituted a custody action in the fall of 2017. Mother and Father reached an agreement after participating in a conciliation in December 2018 whereby Father was to have custody of Child for only one night for approximately three weeks, and then every other weekend. (Notes of testimony, 1/17/20 at 25-26.) Although the testimony suggests the entry of a written order reflecting this agreement, we observe that such custody order was not presented as evidence and is not a part of the record. While Mother testified that she was not aware that Father was moving, Father indicated that this was made clear at the time of the conciliation. (*Id.* at 5, 70.) Father further challenged the nature of his relationship with Child and frequency of custody prior to the institution of this agreement. (*Id.* at 79.)

[3] Father pled guilty to precursor charges with respect to methamphetamines, which relates to possession of chemicals for production. (*Id.* at 11-12, 87-88, 105-106.)

Father last saw Child in mid-January 2018 and last spoke with Child in March 2018.[4] (*Id.* at 4-6, 69-70, 73-74, 77, 84; *see also* Exhibit 1.) He last asked to speak with Child in May 2018.[5] (*Id.* at 6, 18, 21). Father did not send any cards, letters, or gifts for Child (*id.* at 6-9, 11, 59, 64) and did not pay any support (*id.* at 29-30, 92-93). Likewise, Father failed to enforce the custody order that existed between him and Mother and never filed a petition to modify. (*Id.* at 28, 87.)

Mother and her current husband, Z.H. ("Stepfather"), started dating three years ago and began living together shortly thereafter. (*Id.* at 12.) Mother and Stepfather married in August 2019. (Petition for involuntary termination of parental rights, 8/27/19 at ¶ 10.) Mother filed a petition for involuntary termination of parental rights pursuant to 23 Pa.C.S.A.

---

[4] Father testified that he had to replace his phone and lost Mother's phone number in February 2018. (*Id.* at 73, 84.) Although Mother did not respond to his Facebook message providing his phone number and asking her to text him her phone number in return, Father did have several communications, including video chats, with Child through Facebook. (*Id.* at 18-19, 71-74, 84.) While Mother acknowledged blocking one of Father's accounts on Facebook, as well as his sister, she testified that she never blocked a second Facebook account utilized by Father. (*Id.* at 21-25, 30-31, 39.) Father, however, contends that he and his family were blocked on social media, including Facebook and Snapchat, beginning in mid-March 2018, and that he was not able to message Mother on Facebook again until September 2019. (*Id.* at 75, 77, 102.) Notably, Mother changed her phone number in December 2018, as she got a new phone as part of a new plan. (*Id.* at 9-10.)

[5] Upon review of the certified record, it is possible this message came from Father's girlfriend. (Notes of testimony, 1/17/20 at 32-33.)

J. S34044/20

§ 2511(a)(1), (2), and (b) on August 27, 2019.[6]  A hearing was held on January 17, 2020.  Mother testified on her own behalf.  Mother additionally presented the testimony of Stepfather; V.H., her mother; and S.J.H., her father-in-law.  Father testified on his own behalf.  He additionally presented the testimony of T.S., his sister's fiancé.  Heather Paterno, Esq., the attorney/guardian **ad litem** appointed to represent Child, was also present.[7]

---

[6] Stepfather filed a contemporaneous Petition for Adoption with respect to Child.  (Petition for adoption, 8/27/19.)

[7] **See In re Adoption of L.B.M.**, 161 A.3d 172, 175, 180 (Pa. 2017) (plurality) (stating that, pursuant to 23 Pa.C.S.A. § 2313(a), a child who is the subject of a contested involuntary termination proceeding has a statutory right to counsel who discerns and advocates for the child's legal interests, defined as a child's preferred outcome); **see also In re T.S.**,192 A.3d 1080, 1089-1090, 1092-1093 (Pa. 2018) (finding the preferred outcome of a child who is too young or non-communicative unascertainable in holding a child's statutory right to counsel not waivable and reaffirming the ability of an attorney/guardian **ad litem** to serve a dual role and represent a child's non-conflicting best interests and legal interests).  We note, however, our recent opinion in **In re: Adoption of K.M.G.**, 219 A.3d 662 (Pa.Super. 2019) (**en banc**), **granting appeal in part**, 221 A.3d 649 (Pa. 2019) (holding that this court has authority only to raise **sua sponte** the issue of whether the trial court appointed any counsel for the child, and not the authority to delve into the quality of the representation).  Attorney Paterno stated:

> Your Honor, just real quick, I met with the child.  She's 5, not very talkative, very difficult to get a lot of information out of her.
>
> At this point in time, I don't think there's a conflict between best interest counsel and legal interest counsel.  Both attorneys have no objection to me serving on both capacities.  Obviously[,] if something pops up and I think there's a conflict, I'll let you know.

Notes of testimony, 1/17/20 at 1.

- 4 -

Attorney Paterno recommended that Father's parental rights be terminated.[8] (Notes of testimony, 1/17/20 at 116-118.)

By decree dated February 4, 2020, and entered February 6, 2020, the orphans' court granted Mother's petition and involuntarily terminated the parental rights of Father pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), and (b). Thereafter, on March 4, 2020, Father, through counsel, filed a timely notice of appeal, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

On appeal, Father raises the following issues for our review:

> I. Whether the [orphans'] [c]ourt erred and/or abused its discretion by terminating the parental rights of Father, M.M., pursuant to 23 Pa.C.S.A. Section 2511(a)(1)[,] where Father presented evidence that he tried to perform his parental duties however was intentionally denied access and contact with the minor child by Petitioner Mother?
>
> II. Whether the [orphans'] court erred and/or abused its discretion by terminating the parental rights of Father, M.M., pursuant to 23 Pa.C.S.A. Section 2511(a)(2)[,] where Father presented evidence that he tried to provide the minor child with essential parental care and control but was prevented from doing so by Mother's deliberate interference regarding Father's communication and visitation with the minor child despite Father's repeated attempts to contact Mother and locate his child?
>
> III. Whether the [orphans'] court erred and/or abused its discretion by terminating the

---

[8] Attorney Paterno submitted a letter dated June 8, 2020, and filed June 9, 2020, in lieu of a brief, concurring with the orphans' court's opinion.

> parental rights of Father, M.M., pursuant to 23 Pa.C.S.A. Section 2511(b) and failing to give primary consideration to the developmental, physical and emotional needs and welfare of the child?

Father's brief at 7 (extraneous capitalization omitted).[9]

In matters involving involuntary termination of parental rights, our standard of review is as follows:

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." ***In re Adoption of S.P.***, 47 A.3d 817, 826 (Pa. 2012). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." ***Id.*** "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." ***Id.*** The trial court's decision, however, should not be reversed merely because the record would support a different result. ***Id.*** at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. ***See In re R.J.T.***, [9 A.3d 1179, 1190 (Pa. 2010)].

---

[9] Father failed to preserve any challenge related to Subsection (a)(2), as he failed to include any argument and/or discussion related to such issues in his brief. ***See In re W.H.***, 25 A.3d 330, 339 n.3 (Pa.Super. 2011), ***appeal denied***, 24 A.3d 364 (Pa. 2011), quoting ***In re A.C.***, 991 A.2d 884, 897 (Pa.Super. 2010) ("[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived."); ***see also In re M.Z.T.M.W.***, 163 A.3d 462, 465-466 (Pa.Super. 2017). As such, any claim as to Subsection (a)(2) is waived.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G. & J.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.*, 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

The termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear

conviction, without hesitance, of the truth of the precise facts in issue."
*In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000), quoting *Matter of Adoption of Charles E.D.M., II*, 708 A.2d 88, 91 (Pa. 1998).

In the case *sub judice*, the orphans' court terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), and (b). We have long held that, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). We analyze the court's termination decree pursuant to Section 2511(a)(1) and (b), which provide as follows:

> **(a)** **General rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> . . . .
>
> **(b)** **Other considerations**.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect

- 8 -

> to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b).

We have explained this Court's review of a challenge to the sufficiency of the evidence to support the involuntary termination of a parent's rights pursuant to Section 2511(a)(1) as follows:

> To satisfy the requirements of [S]ection 2511(a)(1), the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. In addition,
>
>> Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child and refusal or failure to perform parental duties. Accordingly, parental rights may be terminated pursuant to Section 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child or fails to perform parental duties.
>
> Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Z.S.W.*, 946 A.2d 726, 730 (Pa.Super. 2008) (internal citations omitted).

As it relates to the crucial six-month period prior to the filing of the petition, this court has instructed:

> [I]t is the six months immediately preceding the filing of the petition that is most critical to our analysis. However, the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provisions, but instead consider the individual circumstances of each case.

*In re D.J.S.*, 737 A.2d 283, 286 (Pa.Super. 1999) (citations omitted). This requires the court to "examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination." *In re B., N.M.*, 856 A.2d 847, 855 (Pa.Super. 2004), *appeal denied*, 872 A.2d 1200 (Pa. 2005) (citation omitted).

Further, we have stated:

> [T]o be legally significant, the [post-abandonment] contact must be steady and consistent over a period of time, contribute to the psychological health of the child, and must demonstrate a serious intent on the part of the parent to recultivate a parent-child relationship and must also demonstrate a willingness and capacity to undertake the parental role. The parent wishing to reestablish his parental responsibilities bears the burden of proof on this question.

***In re Z.P.***, 994 A.2d at 1119 (citation omitted); ***see also In re Adoption of***

***C.L.G.***, 956 A.2d 999, 1006 (Pa.Super 2008) (***en banc***).

Regarding the definition of "parental duties," this court has stated:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this Court has held that the parental obligation is a positive duty which requires affirmative performance.
>
> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.
>
> Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.
>
> Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with . . . her physical and emotional needs.

***In re B., N.M.***, 856 A.2d at 855 (internal citations omitted). Critically,

incarceration does not relieve a parent of the obligation to perform parental

duties. An incarcerated parent must "utilize available resources to continue a

relationship" with his or her child. ***In re Adoption of S.P.***, 47 A.3d 817, 828

(Pa. 2012) (discussing ***In re Adoption of McCray***, 331 A.2d 652 (Pa. 1975)).

Instantly, in finding grounds for termination pursuant to

Section 2511(a)(1), the orphans' court stated:

> Here, Mother has met her burden of proving, through clear and convincing evidence, that [Father] has failed to perform, for a period of at least six months, parental duties for the minor child. [Pa.C.S.A.] § 2511(a)(1). Mother credibly testified that [Father] has not been involved in parenting the minor child in the past two years. Following their custody conciliation, [Father] only exercised two of the regular periods of alternating weekend custody he was granted under that agreement before moving to Georgia.
>
> By his own admission, [Father] has not performed any parental duties for the minor child in the past two years, blaming Mother's lack of communication with him. While society has begun to rely more on social media as a form of communication, reaching out to Mother only a few times over social media platforms like Facebook and Snapchat is not enough to establish that [Father] was serious and intent on contacting Mother in an effort to see the minor child. Both parties participated in the custody conciliation; therefore, [Father] was aware of the custody process. Furthermore, while [Father] testified that he was unaware that he could have gone to the self-help center at the Dauphin County Courthouse to assist with his custody matter[,] he, nevertheless, obtained the appropriate paperwork to request an attorney be appointed on his behalf for these proceedings.
>
> Pursuant to [***In re B., N.M.*** (***supra***)], the court is not to apply the six month statutory time frame mechanically, but rather, must look at the history of the custody matter. From the [f]all of 2017[,] following the custody agreement[,] until January of 2018, [Father] only exercised two of his custodial

weekends. He moved out of state in February, 2018. He had two FaceTime calls with the minor child in February and May[10] of 2018. At some point, Mother blocked him on social media platforms. He tried on a few occasions to contact Mother on social media unsuccessfully. In the past three years, he only purchased a pair of shoes, three toys and a bag of lollipops for the minor child. [Father] failed to perform any parental duties for a time period well in excess of six months. Here, in over a two-year period, [Father]'s attempts to overcome the alleged obstacles put in place by Mother, only included contact via social media and two phone calls. Even if [Father]'s testimony were credible regarding his one interaction with Mid Penn Legal Services, and their failure to direct him to the self-help center, [Father] essentially gave up. His hesitancy to pursue any other contact or form of communication with Mother does not exhibit reasonable firmness or perseverance in attempting to see the minor child.

Our courts have repeatedly defined "parental duties" in general as the affirmative obligation to provide consistently for the physical and emotional needs of a child. If a parent is to avoid an involuntary termination of parental rights, it is incumbent upon the parent when separated from his child to maintain communication and association with the child, which requires an affirmative demonstration of parental devotion, imposing upon the parent the duty to exert himself, to take and maintain a place of importance in the child's life. Here, [Father] failed to provide for any physical or emotional needs of the minor child. The mere fact that Mother blocked him on social media does not account for his failure to pursue multiple available avenues to perform his duties. He knew her address for many months after he abandoned contact, as well as where Mother's parents resided. He never exerted himself to take a place of any importance in the minor child's life. As such, under the circumstances, Mother by clear and convincing

---

[10] We believe the court meant March 2018.

- 13 -

> evidence has proven that [Father] failed to perform parental duties.

Orphans' court opinion, 3/27/20 at 9-11 (unpaginated; footnote added).

Father, however, argues that he made various attempts to reach out to Mother in order to communicate with and see Child but was thwarted by Mother. (Father's brief at 16-18.) Father states:

> From March 17, 2018, the date that Mother first denied Father contact with the minor child, through August 27, 2019, the date when Mother and [Stepfather] filed for Termination of Biological Father's Rights, Father attempted to contact Mother and child and/or obtain Mother's contact information ten (10) different ways in an effort to speak to and see his minor child; such as, (1) requesting Mother's telephone number after losing all of his contacts; (2) reaching out to Mother on Facebook Messenger to speak to his daughter and to see her; (3) attempting to reach out to Mother via Snapchat; (4) requesting several family members to reach out to Mother on social media on Father's behalf; (5) requesting that his girlfriend reach out to Mother on Father's behalf; (6) requesting that family members reach out to Step-Father regarding the minor child; (7) contacting [D]omestic [R]elations to try and obtain Mother's telephone number and address; (8) contacting private attorneys; (9) contacting Mid[]Penn Legal Services for assistance; and (10) contacting third party mutual friends to reach out to Mother on his behalf and provide him Mother's information. Despite trying ten (10) different methods to see/speak to his minor child, obtaining Mother's contact information and location proved to be practically impossible even though Father utilized all available resources to preserve the parental relationship and exercised a reasonable firmness against Mother's resistance and attempts toward alienation.
>
> Accordingly, Father presented evidence that he was intentionally prevented from performing his parental

> duties by Mother's deliberate interference regarding communication and visitation with the minor child despite Father's repeated attempts to contact Mother and locate his child.

*Id.* at 17-18.

Upon review, the record supports termination pursuant to Section 2511(a)(1) and we discern no abuse of discretion. The record reveals that Father has a history of substance abuse. Notably, Mother testified that Father used heroin and that she found needles within Child's reach. (Notes of testimony, 1/17/20 at 16, 24.) Father was incarcerated in June 2018 for a period of approximately 14 months related to methamphetamines. (*Id.* at 11-12, 87-88, 105-106.) He further had issues with respect to misuse of medication while incarcerated. (*Id.* at 109.)[11]

Beyond Father's history of substance abuse and incarceration, the record also reveals a lack of support and contact between Father and Child. At the time of the hearing, Father last saw Child in mid-January 2018, when he then left Pennsylvania for work in Georgia and then North Carolina, and last spoke with Child in March 2018. (*Id.* at 4-6, 69-70, 73-74, 77, 84; *see also* Exhibit 1.) He last asked to speak with Child in May 2018.[12] (*Id.* at 6,

---

[11] With respect to the precursor charges relating to methamphetamines, Father testified that he was driving someone else's vehicle and was charged because he would not "tell" on that person. He did, however, plead guilty. (Notes of testimony, 1/17/20 at 88.) As to misuse of medication, Father explained that he had two bottles of Tylenol. (*Id.* at 109.)

[12] As noted *supra*, this message possibly came from Father's girlfriend. (*Id.* at 32-33.)

18, 21.) Father did not send any cards, letters, or gifts[13] for Child (*id.* at 6-9, 11, 59, 64) and did not pay any support (*id.* at 29-30, 92-93).

In contravention to Father's claims of obstacles created by Mother, the evidence establishes that Father did not "utilize all available resources to preserve the parental relationship" or "exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship." *In re B., N.M.*, 856 A.2d at 855. Father indicated that he had to replace his cell phone and lost Mother's telephone number in mid-February 2018. (*Id.* at 73, 84.) When blocked in March 2018, after prior successful social media contact, Father made additional attempts to contact Mother and Stepfather on social media, including creating fake accounts and having others do so on his behalf (*id.* at 30-32, 76-77, 102-03), and attempted to obtain Mother's address from the court[14] (*id.* at 77-78, 91-92, 95, 102-103). Notwithstanding, Father never sent any cards, letters, or packages for Child to Mother's parents' address, or to Mother's in-laws' address, where Mother resided until September 2018. (*Id*. at 7-9, 11, 59, 64.) Despite his

---

[13] Father, however, testified to gifts in his Mother's attic that he was unable to give Child. (*Id.* at 80.)

[14] Specifically, Father stated that he contacted Domestic Relations in order to obtain Mother's contact information. (*Id.* at 77-78, 91-92, 95, 102-103.) Father explained that he thought the court would have such information as a result of the custody matter. Despite acknowledging a support matter with respect to his older son, he indicated a lack of knowledge of a support matter with respect to Child, as well as a lack of knowledge that Domestic Relations handles support but not custody matters. (*Id.* at 70, 93-96.)

incarceration, Father conceded that he had access to paper, envelopes, and stamps. (*Id.* at 88.) Mother testified that Father knew these addresses, and both her mother and her father-in-law confirmed Father's knowledge of where they resided. (*Id.* at 7-9, 11, 59, 64-65.) Specifically, Mother provided her in-laws' address at the time of the custody conciliation. (*Id.* at 7.) Additionally, Father's sister had picked up Child from this address. (*Id.* at 7, 90-91.) Father further knew where Mother's parents lived, as he lived there for three months with Mother and Child following Child's birth. (*Id.* at 8-9, 59, 62.) Father, however, never sent any correspondence or packages to either of these addresses. (*Id.* at 59, 64.) Moreover, Father never sought out Mother and Child and/or their location at either of these addresses in person, despite a trip back to Pennsylvania in the spring of 2018.[15] (*Id.* at 60, 65.) While Father testified that he forgot or did not know these addresses[16] (*id.* at 89-91), it strains credulity that Father did not recall either of these addresses, particularly Mother's parents' address, where he had previously lived.

---

[15] Father testified that he would not have been given a warm welcome if he turned up at the maternal grandmother's home and suggested a letter would have been thrown out in the garbage. (*Id.* at 76, 89.) He further suggested that he would not have just shown up on Mother's doorstep, even if he knew her address, for fear of legal trouble. (*Id.* at 99-100.)

[16] Father additionally suggested that Mother's in-laws moved. (*Id.* at 90.) Mother's father-in-law, however, testified to the same address for the last five years. (*Id.* at 64.)

As to support, Father stated that he "had no way to send [Mother] money because she don't answer the phone." (*Id.* at 92-93.)  Again, we observe that Father could have sent money to Mother at her parents' address or in-law's address.  Further, Father's familiarity with support matters through his older son, as well as his contact with Domestic Relations seeking Mother's contact information (*id.* at 70, 77-78, 91-92, 95, 102-103), belies Father's asserted lack of knowledge of a support matter with respect to Child, as well as a lack of knowledge that Domestic Relations handles support but not custody matters (*id.* at 93-96).

Likewise, Father failed to enforce his custody under the order that existed between him and Mother (*id.* at 87), nor did he file a petition to modify (*id.* at 28).  Although Father stated that he contacted attorneys but was unable to afford an attorney, and unsuccessfully sought assistance from Mid Penn Legal Services in 2018[17] (*id.* at 87, 96-99, 102-103), Father sought no other action with respect to the custody matter.  He took no further actions involving contact with Mid Penn Legal Services or the courthouse in 2019. (*Id.* at 103.)  Father further acknowledged that he never even sought a copy of the custody order from the court.  (*Id.* at 101.)  While testifying that he contacted the court (*id.* at 77-78, 91-92, 95, 102-103), Father indicated that

---

[17] Father noted a conflict of interest with respect to Mid Penn Legal Services. (*Id.* at 87, 97.)  Upon questioning by Attorney Paterno, he stated that they did not refer him to a self-help clinic at the Dauphin County courthouse. (*Id.* at 97-99.)

- 18 -

this was solely to seek Mother's contact information (*id.* at 95). He stated, "It had nothing to do with me getting any paperwork or anything like that." (*Id.* at 95.) Moreover, Attorney Paterno indicated that from her experience it is unlikely that Mid Penn would not have referred Father to the self-help center at the courthouse. (*Id.* at 118-119.) She stated:

> I -- I'm not entirely persuaded by what he did here. I worked extensively with Mid Penn Legal Services. I worked extensively in this county to provide access to the legal system to people of low income. I know what the self-help clinic is about. I know that that is given to the clients universally when they call Mid Penn if there is, in fact, a conflict.

*Id.* She was further skeptical because of Father's prior participation in and knowledge of and familiarity with the legal process related to his older son. (*Id.* at 119.)

As this court has stated, "[A] child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa.Super. 2006). Thus, as the trial court's termination pursuant to Section 2511(a)(1) is supported by competent, clear, and convincing evidence in the record, we find no abuse of discretion. *See In re T.S.M.*, 71 A.3d at 267; *In re Adoption of T.B.B.,* 835 A.2d at 394.

As noted above, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a) before assessing the determination under Section 2511(b). *In re B.L.W.*, 843 A.2d at 384. We, therefore, need not address any further subsection of Section 2511(a) and turn to whether termination was proper under Section 2511(b).

As to whether termination was proper under Section 2511(b), our supreme court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.[A.] § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa.Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

*In re T.S.M.*, 71 A.3d at 267. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-763 (Pa.Super. 2008) (citation omitted).

When evaluating a parental bond, "[T]he court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d at 1121 (internal citations omitted).

Moreover,

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

*In re Adoption of C.D.R.*, 111 A.3d at 1219, quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011) (quotation marks and citations omitted).

In determining that termination of Father's parental rights favored the Child's needs and welfare, the court reasoned as follows:

> Next, the [c]ourt must analyze the determination of the needs and welfare of the child under the standard of best interests of the child. 23 Pa C.S.A. 2511(b). "One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect of the child permanently severing any such bond." [*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007)]. In the instant case, testimony from Mother, her parents, and her husband clearly and convincingly established that the needs and welfare of the child were adequately being met with no assistance from [Father]. Further, there was no evidence presented

of an emotional bond between [Father] and the minor child. This [c]ourt does not believe that permanently terminating parental rights would have an adverse effect on the minor child given the lack of contact between [Father] and minor child, as well as [Father]'s failure to take any meaningful role in the minor child's life whatsoever.

Further, the guardian *ad litem* opined that the best interests of the minor child would be served by terminating [Father]'s parental rights. Specifically, Attorney Paterno was not persuaded by [Father]'s failure to act over an 18-month period and that he could have done more to preserve and assert his parental rights.

Orphans' court opinion, 3/27/20 at 11-12 (unpaginated).

Father, however, argues that Mother alienated Child from him and that such alienation prevented a meaningful relationship between him and his child. (Father's brief at 18-20.) Father states, "Due to Mother's intentional interference and alienation of the minor child, Father never had an opportunity to further develop a significant relationship with his minor child. Thus, it cannot fairly and adequately be determined whether permanently terminating parental rights would have an adverse effect on the minor child." (*Id.* at 19.) He further asserts that by granting termination the court is "condoning" and not only tolerating, but encouraging, Mother's behavior. (*Id.* at 19-20.)

Upon review, we again discern no abuse of discretion. The record supports the trial court's finding that Child's developmental, physical, and emotional needs and welfare favor termination of Father's parental rights pursuant to Section 2511(b). There was sufficient evidence to allow the trial

court to make a determination of Child's needs and welfare and, as to the existence of a lack of a bond between Father and Child that, if severed, would not have a detrimental impact on her.

Significantly, Mother expressed that Child is not safe with Father, referencing his substance abuse history. (Notes of testimony, 1/17/20 at 16-17.)

Further, as described by the guardian *ad litem*/counsel for the Child, Child had not seen Father in a while. Child knew that Father was incarcerated and only remembered Father buying her candy. She could not, however, speak to any of the positive interactions. (*Id.* at 117.)

> She knows -- She talked about [Father], said she had not seen him for [a while]. She said I know that he was in jail. There seemed to be some hesitation there. And, you know, I just talked about the fun things they did together. She couldn't speak about that. She said, you know, he got me candy and recalled saying that. Otherwise, you know, not a whole lot. She didn't indicate that there was any negative discussions regarding him.

*Id.* Similarly, Mother testified that she tells Child that Father is her dad. Mother stated, "I do still tell her that that's dad." (*Id.* at 13.) Nevertheless, Child does not discuss Father, and when asked, there was nothing she wanted Mother to say to Father. (*Id.* at 36.)

Moreover, and more importantly, Child is bonded to Stepfather, whom she calls "dad" or "daddy" and with whom she has lived for approximately three years. (*Id.* at 13, 44, 46.) Stepfather testified that he and Child "hit it

off right away." (*Id.* at 45.) Mother observed that Stepfather and Child "love" one another and that Stepfather does "a lot with and for [Child]." (*Id.* at 12-13.) Stepfather and Child do things together surrounding nature, such as fishing, foraging for mushrooms, hiking, and gardening. (*Id.* at 12-13, 45-46.) Stepfather further provides for Child and teaches Child. (*Id.* at 14-15, 44.) Stepfather taught Child to tie her shoes, bought Child clothes, reads to Child, puts Child to bed at night, and cares for Child when she is sick. (*Id.* at 14, 36.) Additionally, Child seeks comfort from Stepfather and goes to Stepfather when she has problems. (*Id.* at 14, 36, 46.) Mother confirmed that Stepfather fulfills the role of father for Child. (*Id.* at 14.) Likewise, Stepfather testified that he considers himself to be Child's father. (*Id.* at 47.)

Thus, as supported by the record, termination of Father's parental rights serves Child's developmental, physical, and emotional needs and welfare and was proper pursuant to Section 2511(b). While Father may profess to love Child, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *In re Z.P.*, 994 A.2d at 1121. As we stated, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *Id.* at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her

potential in a permanent, healthy, safe environment." ***In re B., N.M.***, 856 A.2d at 856 (citation omitted).

Accordingly, based upon our review of the record, we find no abuse of discretion and conclude that the orphans' court appropriately terminated Father's parental rights under 23 Pa.C.S.A. § 2511(a)(1) and (b).

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 08/28/2020